IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH DIVISION

| | | |
|---|---|---|
| RAYMEL ADDISON, | ) | |
| | ) | |
| Petitioner, | ) | Civil Action No. 2:18-cv-01649 |
| | ) | |
| vs. | ) | Christopher B. Brown |
| | ) | United States Magistrate Judge |
| SUPERINTENDENT BRADLEY | ) | |
| BOOHER, ATTORNEY GENERAL OF | ) | |
| PENNSYLVANIA, and DISTRICT | ) | |
| ATTORNEY OF ALLEGHENY | ) | |
| COUNTY, | ) | |
| | ) | |
| Respondents. | ) | |

## MEMORANDUM OPINION RE:
## RESPONDENTS' MOTION TO DISMISS, ECF NO. 47[1]

**Christopher B. Brown, United States Magistrate Judge**

Petitioner Raymel Addison ("Addison"), a Pennsylvania state prisoner, has filed a counseled Amended Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254.  ECF No. 33.  He is challenging the judgment of sentence imposed on him on January 9, 2006 by the Court of Common Pleas of Allegheny County at numbers CP-02-CR-0011423-2003 (third degree murder) and CP-02-CR-0013549-2003 (firearms violation).

On November 12, 2024, Respondents filed the instant motion to dismiss on the grounds the original habeas petition was untimely filed. ECF No. 47.  Addison, through counsel, filed a response to the motion on December 4, 2024. ECF No. 52.

---

[1]    All parties have consented to full jurisdiction before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  *See* ECF Nos. 41 and 43.

Addison does not dispute the petition is time-barred under the applicable one-year statute of limitations set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") codified at 28 U.S.C. § 2254(d)(1).  But he argues he is entitled to tolling under the fundamental miscarriage of justice exception announced in *McQuiggin v. Perkins*, 569 U.S. 383 (2013), because he is actually innocent of Third-Degree Murder.

The motion is fully briefed and ripe for consideration.  For the reasons below, the motion to dismiss will be granted, the Petition will be dismissed with prejudice as untimely, and a certificate of appealability will be denied.

## I.    Jurisdiction

The Court has jurisdiction under 28 U.S.C. § 2254, the federal habeas statute applicable to prisoners in custody pursuant to a state court judgment.  It permits a federal court to grant a state prisoner a writ of habeas corpus "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

## II.    Timeliness of the Original Petition

Respondents argue because Addison's original Petition was not filed within AEDPA's one-year limitations period, the original Petition and the Amended Petition are time barred and the case should be dismissed with prejudice.  Addison does not dispute that the original Petition was untimely filed but responds he is entitled to tolling under the fundamental miscarriage of justice exception announced in *McQuiggin*.

### A.    AEDPA's One-Year Statute of Limitations

AEDPA imposes a one-year statute of limitations "to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State Court." 28 U.S.C. § 2244(d)(1).  Addison was sentenced on January 9, 2006, and his conviction was affirmed by the Pennsylvania Superior Court on May 30, 2007. *Com. v. Addison*, No. 344 WDA 2006, Memorandum (Pa. Super. Ct. May 30, 2007). No further appeals were taken.  Thus, Addison's conviction became final on June 29, 2007, when the time to seek review expired.  *See* 42 Pa.C.S. § 9545(b)(3). Addison would have had one year after June 29, 2007, the date his conviction became final, in which to file his federal habeas petition.  *See* 28 U.S.C. § 2244(d)(1). Giving Addison the benefit of the prisoner mailbox rule,[2] the original federal petition was filed on December 4, 2018.  Addison, concedes, as he must, that his petition was untimely filed.  Accordingly, absent any tolling period, Addison's petition for federal habeas relief is time-barred.

### B.    Statutory Tolling

The habeas limitations period is subject to statutory tolling for the time during which a "properly filed" PCRA petition is pending in state court. 28 U.S.C. § 2244(d)(2).  Addison, through counsel, filed a timely PCRA petition on June 16, 2008, raising claims of ineffective assistance of counsel. ECF No. 47 at 2, ¶5.  The PCRA court dismissed the petition in August 2008 and the Superior Court affirmed

---

[2]    The "prisoner mailbox rule" dictates that filings of *pro se* prisoners are deemed filed on the date the document was deposited in the prison mailing system or given to prison authorities for mailing. *Houston v. Lack,* 487 U.S. 266, 270-72 (1988).

the dismissal on August 19, 2009.  *Id.,* ¶6.  *Id.*  As no further appeals were filed, Addison is entitled to statutory tolling from June 16, 2008, until September 18, 2009, when the time to seek further review expired.  *See* 42 Pa.C.S. § 9545(b)(3).

None of Addison's four subsequent PCRA petitions toll AEDPA's statute of limitations as all four were denied as time-barred by the state courts.  *See* ECF No. 47-1,[3] 47-2 at 24, 47-2 at 37, and 2024 WL 5135730 (Pa. Super. Ct. Dec. 17, 2024) (dismissal of fifth PCRA petition).[4]  Whether a state petition is untimely is a question of state law.  "When a postconviction petition is untimely under state law, 'that [is] the end of the matter' for purposes of § 2244(d(2)." *Pace v. DiGuglielmo*, 544 U.S. 408, 414 (2005)); *Merritt v. Blaine*, 326 F.3d 157, 165 (3d Cir. 2003) (holding that because petitioner's second PCRA petition was untimely under state law, it was not "properly filed" for purposes of AEDPA).

Addison concedes his Petition is untimely. ECF No. 33.  He argues, though, that had the state courts "correctly" adjudicated his May 1, 2016, pro se supplement to his third PCRA petition,[5] he would be entitled to statutory tolling until August

---

[3]    The Superior Court memorandum attached to the motion to dismiss is not a complete copy. ECF No. 47-1 at 51.  But the complete memorandum is contained in the original state court record provided to the Court by Respondents. ECF No. 50.

[4]    In July 2024, the Court requested counsel for Addison to provide it with a copy of the Superior Court's December 17, 2024, memorandum affirming the denial of Addison's fifth PCRA petition.  ECF No. 37.  Counsel responded he did not have copy of the memorandum. ECF No. 40. The Court, however, obtained an electronic copy through Westlaw.

[5]    The issue of the written plea agreement between Michael Brown and the U.S. Attorney's office was raised in Addison's Supplemental Third PCRA Petition. ECF No. 9-2.  Both the PCRA court and the Superior Court denied the petition as untimely.  The Superior Court determined "[b]ecause Addison failed to plead and prove the application of the PCRA's 'new facts' exception to the time-bar, the PCRA court was without jurisdiction to consider Appellant's Petition.  We are,

26, 2018. ECF No. 33 at 83. Under this scenario, Addison states his Petition is untimely by 102 days,[6] rather than being untimely by 8 years.

The Court finds Addison's argument to be of no moment. Under either scenario, be it 102 days or 8 years, the Petition was untimely filed. Although Addison is entitled to receive some amount of statutory tolling, the Petition remains time barred. Having failed to meet AEDPA's one-year statute of limitations, the Petition can be saved only by the application of equitable tolling or the Supreme Court's recognized fundamental miscarriage of justice exception. *See Holland v. Fla.*, 560 U.S. 631 (2010) (statute of limitations may be equitably tolled with showing of diligence and extraordinary circumstances); *see also McQuiggin,* 569 U.S. 383 (2013) (equitable exception to statute of limitations for actual innocence claim on an otherwise untimely petition).

### C.    Equitable Tolling

The limitations period for Section 2254 petitions is subject to equitable tolling in appropriate circumstances. *Holland,* 560 U.S. at 645-49. A habeas petitioner may receive equitable tolling only if the petitioner shows "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Id*. at 649 (citing *Pace*, 544 U.S. at 418). Both elements must be met. *Id*. A petitioner seeking application of the doctrine

---

likewise, without jurisdiction." Accordingly, the Superior Court affirmed the dismissal of the third PCRA petition as time-barred. ECF No. 47-2 at 30.

[6]    The Amended Petition states Addison placed his original Petition in the prison mailing system on December 6, 2018, ECF No. 33 at 90; however, the original Petition states Addison placed the Petition in the prison mailing system on December 4, 2018. ECF No. 4 at 15.

bears the burden of showing that it should apply to him.  *Id.*; *see also Lawrence v. Fla.*, 549 U.S. 327, 336 (2007) (to receive equitable tolling, the petitioner must prove the above two requirements).

Addison does not argue for equitable tolling but argues he should be excused from AEDPA's statute of limitations because he is factually innocent of Third-Degree Murder.

### D.    Miscarriage of Justice / Actual Innocence Exception

In *McQuiggin*, the Supreme Court of the United States held that actual innocence, if proved, serves as a gateway allowing a habeas petitioner to overcome an impediment due to a procedural bar or expiration of the statute of limitations. *McQuiggin*, 569 U.S. at 386.  In other words, an untimely petition for federal habeas corpus relief may be reviewed upon a showing that a "fundamental miscarriage of justice" has occurred, where "a constitutional violation has probably resulted in the conviction of one who is actually innocent[.]"  *Id.* at 392 (citing *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986)).

In *McQuiggin*, the Supreme Court stressed how narrow the miscarriage of justice exception is to AEDPA's statute of limitations, and consequently how rare a successful miscarriage of justice exception would occur:

> We hold that actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, as it was in *Schlup* and *House*, or, as in this case, expiration of the statute of limitations. We caution, however, that tenable actual-innocence gateway pleas are rare: "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror,

acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup,* 513 U.S. at 329, 115 S.Ct. 851; *see House*, 547 U.S., at 538, 126 S.Ct. 2064 (emphasizing that the *Schlup* standard is "demanding" and seldom met). And in making an assessment of the kind *Schlup* envisioned, "the timing of the [petition]" is a factor bearing on the "reliability of th[e] evidence" purporting to show actual innocence. *Schlup,* 513 U.S., at 332, 115 S.Ct. 851.[7]

*McQuiggin*, 569 U.S. at 386-87. "The gateway should open only when a petition presents 'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial.'" *Id*. at 401 (quoting *Schlup*, 513 U.S. at 316).

A petitioner must show "he is, in fact, innocent." *Sistrunk v. Rozum*, 674 F.3d 181, 191 (3d Cir. 2012). "[A]ctual innocence means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998); *Sweger v. Chensey*, 294 F.3d 506, 523 (3d Cir. 2022) ("actual innocence requires a showing of factual innocence, not mere legal insufficiency."). To meet the actual innocence standard, the petitioner must "demonstrate (1) new evidence (2) that is reliable and (3) so probative of innocence that no reasonable juror would have convicted the petitioner." *Sistrunk*, 674 F.3d at 191 (citing *Schlup*, 513 U.S. at 324). In *Schlup*, the Supreme Court emphasized that "[w]ithout any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself

---

[7]    In *Schlup*, the Supreme Court distinguished habeas petitions asserting claims of actual innocence for when no constitutional error is alleged, as in *Herrera v. Collins*, 506 U.S. 390 (1993), from petitions in cases, such as the instant case, where a constitutional error allegedly occurred. *Schlup,* 513 U.S. at 314-15. The petitioner in the latter scenario does not argue that his innocence entitles him to habeas relief, but that his innocence entitles him to have a federal court consider the merits of his constitutional claims despite a procedural bar that would ordinarily preclude such review. *Id*. at 315. In such a case, a credible claim of actual innocence only operates as a "gateway" through which a petitioner may pass and obtain federal review of his claims.

sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim." 513 U.S. at 316.

Addison will only overcome his time-barred petition if he can make a credible "showing of actual innocence" under *McQuiggin*.[8] This is no simple task. As the Supreme Court emphasized, "The miscarriage of justice exception, we underscore, applies to a severely confined category: cases in which new evidence shows 'it is more likely than not that no reasonable juror would have convicted [the petitioner].'" *McQuiggin*, 569 U.S. at 394-95 (quoting *Schlup*, 513 U.S. at 329); *see also House v. Bell*, 547 U.S. 517, 538 (2006) (emphasizing the *Schlup* standard is "demanding" and seldom met); *Reeves v. Fayette SCI*, 897 F.3d 154, 161 (3d Cir. 2018), *as amended* (July 25, 2018) ("[t]he gateway actual innocence standard is 'demanding' and satisfied only in the 'rare' and 'extraordinary' case where 'a petition presents evidence of innocence so strong that a court cannot have

---

[8]      The Court notes Addison's actual innocence claim is not the "prototypical example of 'actual innocence' in a colloquial sense . . . where the State convicted the wrong person of the crime." *Sawyer v. Whitley*, 505 U.S. 333, 340 (1992). Addison does not contest he committed the physical act of killing Jamon Miyares. Rather, he argues he is factually innocent of Third-Degree Murder because the killing was legally justified as an act of self-defense. The Court of Appeals for the Third Circuit has "never reached the question of whether such [a defense] can, as a matter of law, satisfy the actual innocence standard because, in all cases to date, the defendants failed to demonstrate actual innocence on the facts." *Wallace v. Mahanoy*, 2 F.4th 133, 152 n. 25 (3d Cir. 2021). *See Sweger v. Chesney*, 294 F.3d at 506, 522 (3d Cir. 2022) ("we assume arguendo for purposes of this opinion that the actual innocence test applies in a non-capital case where 'there is evidence that defendant committed the crime but argues that he or she was responsible for a lesser degree of guilty.'") (internal citation omitted); *In re Minarik*, 166 F.3d 591, 607 (3d Cir. 1999) ("We further assume that "actual innocence" of the crime charged would include the situation where the new evidence would show the petitioner not guilty of first degree murder, though guilty of some lesser offense. Even under these assumptions, however, Minarik cannot show "actual innocence" because he has failed to establish the necessary factual basis); *Glass v. Vaughn*, 65 F.3d 13, 16 (3d Cir. 1995) ("The Supreme Court has not decided whether the actual innocence test is applicable in a noncapital case when there is evidence that defendant committed the crime but argues that he or she was responsible for a lesser degree of guilt."). For purposes of this Memorandum Opinion only, the Court will assume *arguendo* that the actual innocence standard applies.

confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.") (quoting *McQuiggin*, 569 U.S. at 386, 392, 401).

## III.    The Federal Habeas Proceedings

Addison filed pro se his original Petition on December 4, 2018, raising three grounds for relief:

> • a due process claim contending the "[t]he Commonwealth withheld evidence of a plea agreement it had with one of its witnesses.  It further failed to correct the witness's denial of an offer of an agreement during his testimony[;]"
>
> • "denial of right of autonomy" contending trial counsel "conceded Petitioner's guilt despite and over Petitioner's insistence he was innocent[;]" and
>
> • "actual innocence."

ECF No. 4*, ¶* 12.  On May 22, 2019, the District Court adopted the Report and Recommendation and dismissed the Petition as untimely. ECF Nos. 5, 10, 12, and 13.  Petitioner filed pro se a timely Notice of Appeal, ECF No. 15, and the Court of Appeals for the Third Circuit granted a certificate of appealability. ECF No. 20.  Respondents filed a motion to remand in lieu of a brief and the Court of Appeals then remanded the case back to the District Court on May 30, 2023. ECF No. 20.

The case was reopened on May 31, 2023, and reassigned to Magistrate Judge Cynthia Reed Eddy.[9] ECF No. 22.  On November 13, 2023, Addison's motion for appointment of counsel was granted. ECF No. 26.  On June 22, 2024, counsel filed a

---

[9]    When the Petition was filed in 2018, the case was assigned to Magistrate Judge Robert C. Mitchell, who retired in 2019.

181-page Amended Petition. ECF No. 33.  On July 3, 2024, as a result of the

retirement of Judge Eddy, this case was reassigned to the undersigned.  In August

2024, the parties consented to full jurisdiction before a United States Magistrate

Judge pursuant to 28 U.S.C. § 636(c).  *See* ECF Nos. 41 and 43.

Addison raises two claims in his Amended Petition, both centered on

Addison's contention that the prosecutor withheld information that Commonwealth

witness, Michael Brown, had brokered a leniency / plea agreement with the U.S.

Attorney's Office in exchange for his trial testimony in Addison's homicide case:

> 1.    Michael Brown, ADA Stephie Kapourales, ADA
> Ross Lenhardt, and the [District Attorney's Office]
> violated Raymel Addison's due process right to a fair trial
> by presenting knowingly false evidence, substantially
> misleading testimony, and by failing to correct the record
> when the falsity of Michael Brown's testimony and
> substantially misleading nature of ADAs Stephie
> Kapourales's and Ross Lenhardt's testimony was
> uncovered.

> 2.    The [District Attorney's Office] rendered Raymel
> Addison's trial fundamentally unfair by suppressing
> material impeachment evidence regarding Michael
> Brown.

ECF No. 33 at 132, 149.  The Amended Petition discusses the *McQuiggin* standard

at length, ECF No. 33 at 93-131, and also provides a detailed factual account based

on the trial testimony of several fact witnesses, including the testimony of Michael

Brown.  *Id*. at 15-31.

Respondents move to dismiss the Amended Petition arguing Addison's claims

are time-barred and Addison "fails to meet the actual innocence gateway standard

necessary to overcome the time-bar." ECF No. 47 at 15.  Specifically, Respondents

argue Addison's new evidence – Brown's plea agreement with the U.S. Attorney's
office – "constitutes potential impeachment evidence to challenge Brown's trial
testimony" and "evidence that Brown had a plea agreement for so[me] form of
nonspecified leniency does not constitute actual, factual innocence under
*McQuiggin*." ECF No. 47, ¶¶ 78, 79.   Further, Respondents argue,

> Petitioner fails to prove that *no reasonable juror*
> would have convicted him of Third-Degree Murder had
> they been informed of a plea agreement with Michael
> Brown offering him leniency at sentencing in exchange for
> his testimony.  As it was, the jury was already aware that
> this was a distinct possibility for Brown.  Moreover, they
> were aware of Brown's different versions of events
> regarding the homicide.

*Id.*, ¶ 81 (emphasis in original).  Addison responds:

> had the DAO disclosed the leniency agreement – it's more
> likely than not each juror would've concluded Michael
> Brown changed his narrative so close to trial not because
> his  - "Addison fired first" – trial testimony represented
> the truth, but because this narrative <u>substantially</u>
> <u>assisted</u> ADA Fitzsimmon's efforts to raise reasonable
> doubt regarding Addison's self-defense claim, and Brown
> needed to substantially assist the DAO to trigger the
> leniency agreement's provisions.

ECF No. 52 at 22-23 (emphasis in original).

### A.    New Evidence – Michael Brown's Written Plea Agreement[10]

---

[10]    On December 27, 2016, Addison filed in the PCRA court a counseled "Final Amended
Petition" arguing he had "after-discovered evidence" showing the Commonwealth had offered
Michael Brown a plea deal and that Brown "had brokered a plea agreement with the U.S. Attorney's
Office for the Western District of Pennsylvania . . . before he testified against Addison on October 13,
2005, and his state court testimony against Addison triggered the plea agreement's leniency
components regarding his potential federal prison sentence[.]" ECF No. 33 at 10.  *See also* Superior
Court Memorandum, 9/11/2017 affirming dismissal of PCRA petition as untimely ("Appellant
exclusively argued the merits of his 'after-discovered evidence claim' . . . [and] neglects to establish
that the trial court had jurisdiction to consider his Petition. . . . the PCRA court was without

The first determination the Court must make is whether Addison has presented new and reliable evidence to support his "actual innocence" claim. To this end, Addison relies on the written plea agreement between Brown and the U.S. Attorney's office, ECF No. 33-1 at 143, and the Government's Motion Pursuant to Section 5K1.1 of the Sentencing Guidelines filed in Brown's federal criminal case. *Id.* at 188. Respondents do not dispute Addison's evidence is new or that the evidence is not reliable.

Therefore, the Court must turn to the next determination: is this new reliable evidence sufficiently persuasive under *Schlup* for a gateway showing of actual innocence. The overarching question is whether Michael Brown's plea agreement supports Addison's allegation that a jury would not have convicted him of Third-Degree Murder in light of this "new evidence." *See Schlup,* 513 U.S. at 327-28.

### B.    Consideration of "New Evidence"

Addison argues Brown's written plea agreement supports his gateway claim of actual innocence because it shows the Commonwealth knew about the "brokered" agreement with Brown and knowingly presented false testimony in violation of Addison's right to due process. Respondents deny Addison's claim of a *Brady* violation, but argue, "assuming *arguendo* that there was a *Brady* violation,

---

jurisdiction to consider Appellant's Petition. We are, likewise, without jurisdiction." ECF No. 47-2, at 30.

[Addison] has failed to meet the actual innocence gateway standard necessary to overcome the time-bar." ECF No. 47 at 15.[11]

The record contains a written plea agreement letter dated October 20, 2005, from the U.S. Attorney's office to Brown's counsel in his federal criminal case. ECF No. 33 at 143. Under the terms of the agreement, Brown agreed to:

- plead guilty to illegal possession of a firearm by a convicted felon;

- "assist law enforcement agencies in investigating violations of state homicide statutes and related offenses[;] and

- "testify in grand jury, pretrial, trial, sentencing and post-conviction proceedings in this district and elsewhere."

*Id.* at ¶¶(B)1, 2, and 7. In exchange, the U.S. Attorney's office agreed, *inter alia*, to file, in its discretion, a motion for sentence reduction and to advise the sentencing court of Brown's substantial assistance. *Id.* at ¶(B) 5. As to possible penalties, the plea agreement stated the parties agreed the penalty that may be imposed is "[a] term of imprisonment of not more than ten (10) years." *Id.* at ¶C(1). However, if "is determined that Michael T. Brown has 3 previous convictions for violent felonies or serious drug offenses or both, the term of imprisonment is not less then 15 years

---

[11]     Along with raising a *Brady* violation, the Amended Petition also raises a *Napue / Giglio* claim against the Deputy District Attorney and witnesses Assistant District Attorneys Stephie Kapourales and Ross Lenhardt. ECF No. 33 at 139-143; 169-172. While Addison's new evidence may constitute a meritorious constitutional violation(s), *Schlup*, 513 U.S. at 316, the Court is not resolving that issue. Instead, the question this Court is answering is this – has Addison shown it is more likely than not that no reasonable juror would have convicted him in light of the new evidence. *Schlup*, 513 U.S. at 299.

and not more than life . . . ." *Id.* The plea agreement was signed by Brown on October 31, 2005. *Id.* at 6.

At Brown's change of plea hearing on October 31, 2005, the AUSA summarized the Government's obligation to file a sentence reduction motion:

> the United States Attorney will consider the cooperation that you have given in the cases that we have talked about and if we consider you have given substantial assistance in the prosecution and investigation of other people, we can move the Court to file a motion to reduce your sentence. That's entirely up to us in good faith. And it's up to the Court on whether that motion will be granted and, if it is granted, how much your sentence will be reduced.

Transcript, Change of Plea Hearing, 10/31/2004, ECF 47 at 165.

Brown's counsel explained Brown had completed the assistance portion of the plea agreement:

> For the record, Your Honor, he's already testified in a homicide trial in the Court of Common Pleas of Allegheny County, so he has completed that portion of – he has kept his end of the bargain. . . . I was there when he testified and he did testify at the homicide trial.

*Id.* at 167.

At the sentencing hearing on June 14, 2006, the sentencing court asked the AUSA to discuss the Government's 5K1.1 motion. The AUSA responded:

> Not much to say, Your Honor. Fair is fair. Mr. Brown made a bargain with us, so we're holding up our end. He assisted Mr. Fitzsimmons in the DAs office with getting a third-degree murder conviction. Apparently, his testimony helped blunt the self-defense issue, which might have otherwise resulted in an acquittal . . . .[.]

> [W]e're asking the Court to grant the motion and award a
> departure to recognize Mr. Brown's cooperation in the
> homicide matter[.]

Transcript, Sentencing Hearing, June 14, 2006 (ECF No. 47 at 225-26).

Against this backdrop, the Court turns its attention to the factual background and procedural history of Addison's state court criminal proceedings as well as to the newly supplemented record. In doing so, the Court is aware the central issue before the Court is whether Addison has made a sufficient showing of actual innocence to be entitled to relief based on the Supreme Court's decision in *McQuiggin*. The Court's task in reviewing an actual innocence claim is not to exercise its own judgment as to whether a reasonable doubt existed, but to make "a probabilistic determination about what reasonable, properly instructed jurors would do." *House*, 547 U.S. at 538 (quoting *Schlup,* 513 U.S. at 329). Any evaluation of the new evidence must be considered in light of what was presented to the jury and factored into the verdict. The Court must presume that the jurors would fairly consider all the evidence presented and conscientiously adhere to the requirement that guilt be proven beyond a reasonable doubt. *Id*. (citing *Schlup*, 513 U.S. at 329).

## IV.    The State Court Criminal Trial

Addison was tried by jury in the Court of Common Pleas of Allegheny County between October 11, 2005 and October 17, 2005, before the Honorable Kathleen A. Durkin. The jury convicted him of Murder of the Third Degree and Carrying a Firearm Without a License. ECF No. 47-2 at 37; TT at 733-34. On January 9, 2006, the trial court sentenced him to a term of incarceration of 20 to 40 years on the

Third-Degree Murder conviction, to run consecutive to a federal sentence which had

been imposed in July 2005,[12] and 14 months to 7 years on the firearm conviction to

be served consecutive to both the federal sentence and the sentence imposed for the

Third-Degree Murder conviction. ECF No. 47-2 at 37.  Addison was represented at

trial by Attorney Patrick J. Thomassey; the Commonwealth was represented by

Deputy District Attorney Daniel Fitzsimmons. The Superior Court described the

evidence presented at trial as follows:

> On the night of July 22, 2003, [Addison] received a phone
> call from his girlfriend, Tennille Tomlin.[13]  Tomlin told
> [Addison] to come to a bar called the Uptown Cafe to
> "handle" the victim, Jamon Miyares, who had been acting
> in a disrespectful manner toward her. Tomlin was
> arguing there with the victim, Miyares, over his use of
> derogatory terms. Following that call, [Addison] and his
> friend Michael Brown went to the bar looking for the
> victim Miyares. Tomlin and Miyares had a confrontation
> outside the bar and Tomlin hit the victim over the head
> with a bottle. [Addison] and Miyares each pulled out a
> gun. Miyares shot [Addison] once in the leg and [Addison]
> fired back three times and fatally wounded the victim.
> Miyares was hit in the head, abdomen, and leg, and
> collapsed on the sidewalk next to [Addison's] still running
> vehicle.

---

[12]      On February 17, 2004, a federal grand jury sitting in the United States District Court for the
Western District of Pennsylvania returned a two-count indictment against Addison charging him
with possession with intent to distribute five grams or more of cocaine base and possession of a
firearm by a convicted felon.  *See United States v. Addison*, Criminal Case No. 04-cr-0023.  He was
sentenced on July 15, 2005, to 188 months of imprisonment, to be followed by 4 years of supervised
release.  Criminal Case No. 04-cr-0023, ECF No. 28.

[13]      Tennile Tomlin did not testify at Addison's trial.

*Com. v. Addison*, No. 1144 WDA 2012, 2013 WL 11259339, at *1 (Pa. Super. Ct. July 1, 2013) (quoting PCRA Court Opinion, 12/13/2012 at 1-2). ECF No. 33-1, at 291.[14]

### A.    Opening Statements

During his opening statement, the Deputy District Attorney informed the jury that Michael Brown's testimony would be "central to the prosecution's presentation[.]" TT at 40.  He asked the jury to "observe [Michael Brown] and listen to him and see what he has to say and whether you think and believe and rely upon what he has to say." *Id*. at 40-41.

Counsel for Addison also addressed the jury in an opening statement. He told the jury in deciding the case, it would "have to deal with . . . the concept of what is called justification.  The law permits under certain circumstances, even something as terrible as this, that the taking of another human life is justified under the circumstances." *Id*. at 48; *see also id*. at 54 ("[w]hen somebody says I was justified in protecting myself in shooting somebody, the burden is on the district attorney's office to prove not only that somebody committed the shooting but they also must prove beyond a reasonable doubt that it was not justified.  That is the law.").

Defense counsel also discussed Michael Brown's anticipated trial testimony noting Brown had made several statements to the police about the shooting incident, but only in his last statement did he state Addison "shot first and as a reward the district attorney's office dismisses the criminal indictment with attempt

---

[14]    The correct spelling of Mr. Miyares's first name is "Jamon."  In the trial transcript, his name was often transcribed as "Jamone."

(sic) murder of the police." *Id*. at 53.  Defense counsel informed the jury it "will have to decide whether or not [Michael Brown] is believable or whether or not Donald Richards[15] is believable or whether or not [Addison] did anything that night." *Id*. at 53.

### B.    Witness Testimony

The Commonwealth called 17 witnesses during its case-in-chief and Defendant called 2 witnesses in his case-in-chief.  Addison did not testify on his own behalf.  Below is a summary of the salient trial testimony.

### i.    The Commonwealth's Case-in-Chief

**James Stallworth** testified he knew both the victim, Jamon Miyares, and Raymel Addison.  TT at 175-76.  Stallworth came to the Uptown Cafe around 8:00 PM or 9:00 PM on the night of July 22, 2003.  *Id*. at 175.  He agreed Miyares was "picking with" everyone in the bar, and Miyares was arguing with the girl he was with, Tanisha Harris, and with Tomlin.  Miyares continued to argue with Tomlin after Harris left.[16]  *Id*. at 178-180.  At one point, Stallworth stepped outside the bar and saw five people standing there, including Addison.  Miyares was standing with his back against the wall, with the others facing him.  *Id*. at 187.  Miyares "pulled his gun out and waving it a little bit and put it back in his pants, the back of his

---

[15]    Donald Richards was called by the defense as a witness in its case-in-chief.  His testimony is discussed below.

[16]    Tanisha Harris testified she and Miyares had been arguing at the Uptown Bar.  TT at 247.  She eventually left the bar and was not in the area when the shots were fired.  *Id*. at 248-49.

pants." *Id*.[17]  Before putting the gun back in his pants, Miyares was pointing the gun up in the air.  *Id*. at 190.  After watching Miyares return the gun to his waistband, Stallworth stepped back inside the bar and about 2-3 minutes later he heard about four or five gun shots.  *Id*. at 193-94.  He testified, for his own safety, he waited about 30 seconds before going outside, and when he did, he saw Miyares on the ground.  *Id*. at 194.  He and Tosha Lindsey[18] stayed with Miyares until the paramedics arrived.

On cross-examination, Stallworth testified he saw a gun fall out of Miyares pants while they were in the bar.  *Id*. at 203.  He stated, however, he did not see Miyares racking the slide of his gun.  *Id*.  When he saw Miyares outside the bar, he saw Miyares waving the gun, but he did not see him fire it.  *Id*. at 205.

**City of Pittsburgh Police Officer Bryan Sellers** testified he arrived at the scene but then was dispatched to Presbyterian Hospital around 12:50 a.m. with a report there was a victim there who had been shot in the same location as Miyares and had been brought into the hospital by three individuals.  TT at 327.  Upon arrival at the hospital, Sellers spoke to these individuals who identified themselves as Deon Williams, Tennille Tomlin, and Nate Coleman.  *Id*. at 328-29.  Only Deon Williams's identification was confirmed through a driver's license.  *Id*. at 329.

---

[17]    Stallworth later clarified that he did not see Miyares put the gun back into his pants, but he saw Miyares appearing to make the motion to put it back. Stallworth stepped back inside the bar at that point.  TT at 191.

[18]    Detective Weismantle testified a subpoena had been issued for Tosha Lindsey to testify at trial, but he had been unable to locate her.  "We checked our database and other agencies.  Her most current address was in Braddock . . . She left that approximately a month ago with no forwarding information." TT at 542.

Officer Sellers later learned that the individual who had identified himself as "Nate Coleman" was in fact Michael Brown and in addition to giving a false name, Brown had provided police with an incorrect birth date, address, and phone number. *Id.* at 329, 330, 336-37, 343.

Officer Sellers also spoke with Addison while he was being treated in the emergency room. *Id.* at 331. Sellers testified Addison told him,

> he was headed down to the Uptown Bar to pick up his girlfriend, Ms. Tomlin, and he said when he pulled up, he got out to go around to let her in the car and that's when he heard gunshots. He didn't see anything. He didn't see who was shooting. He just realized he had been shot . . . .

*Id.* at 334.

**City of Pittsburgh Detective Steven Hitchings** testified after being notified that Addison had signed himself out of the hospital, he went to Addison's apartment and asked him to come to the police station to be interviewed. Addison voluntarily agreed to be interviewed and gave this account of the incident:

> He told us that he was at home in his apartment, 2031 Fifth Avenue, and at sometime around 1:00 or 2:00 in the morning his girlfriend, Ms. Tomlin, requested that he come pick her up at a bar down the street from their house. He said he got dressed, drove down the street, and parked a couple of doors away from the bar. When he got to the bar, he heard gunshots and was shot in the leg.
>  . . .
>
> He said when he exited his car he heard the shots, looked, and he observed the man he said was killed shooting towards Downtown Pittsburgh and he said someone was shooting back at him who would have been down the street away from Downtown Pittsburgh and stated he was shot in the leg.

TT at 347-49.

Detective Hitchins testified that after speaking with Addison, he obtained a warrant for his arrest and a search warrant for firearms in his residence. *Id*. at 350. The warrants were served on July 27, 2003, and Addison was arrested without incident at his apartment. *Id*. at 351-52.

**Michael Brown** testified he knew both Addison and Miyares. TT at 372, 428. On the night of the incident, he met Addison at his apartment around 11:00 PM and bought "weed" from him. *Id*. at 379-380, 383. They were on the sidewalk outside the apartment smoking, when Addison got a call from his girlfriend. Brown overheard Addison tell her he was on his way, to calm down. *Id*. at 386-87. Brown drove with Addison to the bar; Brown went inside, but Addison did not. *Id*. at 393.

As Brown entered the bar, he saw Deon Williams and Miyares outside, and Tomlin was coming out. *Id*. at 396. Minutes later, Brown went outside. *Id*. at 400. He saw and heard Tomlin arguing with Miyares. *Id*. at 401-402. Miyares said, "get that bitch out of my face," and Tomlin then hit him on the side of the head with a bottle. *Id*. at 402. Miyares repeated, "get that bitch away from me," backed up, and pulled a gun from his waistband. *Id*. at 403. Addison also pulled out a gun and fired "a warning shot." Miyares then pointed his gun knee-level at Tomlin and Addison, but the gun jammed. *Id*. at 407, 410. According to Brown, Addison then fired three shots at Miyares. *Id*. at 411.

At that point, Brown ran from the scene and testified he saw Deon Williams in his truck. *Id*. at 414. Brown got into the truck and suggested they leave.

Williams refused stating he was waiting for Addison. Addison and Tomlin then ran to the truck and the four of them drove to Presbyterian Hospital. On the way to the hospital, they discussed what they would tell the police, and Addison suggested they say he was shot in an attempted robbery. *Id*. at 421. Brown acknowledged that while at the hospital with Addison, he had given the police a false name, address, and phone number and had lied about what had happened. *Id*. at 424-27. He testified he did this because at the time he was on federal probation and he did not want to get in trouble with the "federal probation people" and he stuck with the plan the four of them had discussed while driving to the hospital. *Id*. at 425, 427.

Sometime later, Brown was arrested on unrelated state charges and was being held in Allegheny County Jail ("ACJ"). On December 7, 2004, homicide detectives took Brown out of ACJ and took him to the homicide office where he spoke with homicide detectives and Deputy District Attorney Fitzsimmons. *Id*. at 431. During this time, Brown had both state and federal criminal charges pending against him. *Id*. at 432.

Brown testified he was hesitant to talk about the incident because he "was cool with both of them, the defendant and the people that died. . . . I really didn't want to have nothing to do with the case." *Id*. at 435. During the first interview, Brown told the detectives he talked with Addison while both were confined at ACJ and Addison told him "things looked good for him" because the police could not locate "Donald" and so Addison could fight the charges with self-defense. *Id*. at 436-38. Brown expressed concern to the police detectives about his safety during the

interview and, as a result, after the interview he was moved to a different jail. *Id*. at 436.

About a week later, Brown again spoke with the police. The attorney representing him on his federal criminal charges was present during this interview. This time, Brown expanded on the details of the shooting incident. Brown had since been moved back to Allegheny County Jail. And because of being mistreated by other inmates, Brown testified at trial he changed some of the details in his previous statement. *Id*. at 448-49. He "got in a fight and stuff," he had been threatened, and references were made to his testifying in the Addison trial. *Id*. at 449-50.

At the time of his testimony in the Addison trial, Brown had several pending state criminal cases and a pending federal case on a gun possession charge. The federal charge was related to a state charge involving shooting at police. *Id*. at 441-45. He testified he was told this state charge had been dismissed after he was indicted in federal court. *Id*. at 445. The following exchange then occurred:

> Q: Have you asked the police or any prosecutor to dismiss any of your cases as a reward to you for testifying here?
>
> A: No, sir.
>
> Q: Now, do you hope or expect that the fact that you did tell the police about the incident when they came and took you out of jail and because you testified in this case today and perhaps tomorrow or whatever, do you hope and expect that that will be taken into consideration if you are found guilty of the crimes that you are charged with and you go to sentencing in front of a judge?
>
> A: *I hope. I don't know that. I believe that. I hope.*

. . .

Q:  Okay.  Well, has anybody promised you that you will get a certain sentence in federal court or on your state court charges that are pending against you?

A:  No, nobody tells me nothing like that.

Q:  Do you know how much time you are facing down in federal court?

A:  About seven years, I think.

Q:  Seven years?

A:  That is it.

Q:  Do you know what the most time you could get is?

A:  About five or seven, I think.

Q:  Is that what you've been told?

A:  Yes.  I'm really not sure.  My lawyer really didn't tell me yet.  I really don't know yet.

Q:  Has anyone told you that you might get 15 years to life for that crime down there, sir?

A:  No, sir.  I aint' really – no.

Q:  So from what you've said, you've been told or you expect currently that you might get somewhere around seven years; isn't that right?

A:  I think so.  I think.  He really didn't tell me yet.  He didn't tell me nothing yet.

. . .

Q:  Sir, after you're done testifying, you are still facing all these charges; am I right?

A:  Yes, sir.

*Id*. at 446- 450 (emphasis added).[19]  Brown testified in addition to his pending

federal criminal charges, he had pending state charges related to tampering with

evidence and possession of drugs from June 2003.  *Id*. at 451.

On cross-examination, Brown was questioned about the inconsistencies in his

prior statements and his direct trial testimony.  *Id*. at 451-463.  He acknowledged

he had only recently remembered Addison had fired a "warning shot."  *Id*. at 455.

When asked on cross-examination to explain what happened that night, Brown

testified Miyares took out his gun and pointed it down at Addison's knees; Addison

then fired a warning shot.  *Id*. at 459.

---

[19]    Addison argues "[b]ased on what we know about Michael Brown's leniency agreement and his ultimate prison sentence – Brown may've accidentally let the cat out of the bag here because his 5-7 year prison sentence statement is eerily close to the 8-year prison sentence he ultimately received."  ECF No. 52 n.19.  In the Amended Petition, Addison states, "Brown's actual federal prison sentence, however was only 8 years – making ADAs Lenhardt's and Kapourales's testimony significantly misleading – if not outright false."  ECF No. 33 at 150. (The testimony of Lenhardt and Kapourales is discussed below).  This argument is, at best, disingenuous.  The record reflects the sentencing court determined Brown was an armed career criminal under the Armed Career Criminal Act, which subjected him to a term of imprisonment of 15 years to life.  ECF No. 33 at 58.  This range is consistent with the testimony of both ADA Lenhardt and ADA Kapourales.  At the sentencing hearing on June 14, 2006, the Court determined that the applicable Guidelines range was 180-210 months (15 years – 17.5 years) imprisonment, irrespective of the Government's motion for downward departure pursuant to 5K1.1.  ECF 33-1 at 226.  This too tracks with ADA Lenhardt's testimony that the only way Brown could "get under" the mandatory sentence would be if a 5K1.1 motion was granted.  The Court then granted the Government's 5K1.1 motion, which resulted in Brown being sentenced below the 15 year mandatory minimum, albeit to a term of 156 months, or 13 years.  *Id*. at 231. Three years later on February 26, 2009, because of the Supreme Court's decision in *Chambers v. United States*, 555 U.S. 122 (2009), the Court of Appeals for the Third Circuit vacated Brown's sentence and remanded for resentencing.  *Id*. at 59.  Brown was originally determined to be an Armed Career Criminal based on then-qualifying three prior convictions including one for "walk away escape."  The *Chambers* decision determined that such convictions do not qualify as a predicate under the Armed Career Criminal Act.  Given this, Brown was resentenced on June 3, 2009.  *Id*.  As a result, he was no longer subject to the mandatory minimum 15-years to life sentence and his original offense level of 31 under the federal sentencing Guidelines was reduced to 25, and he was resentenced to a term of imprisonment of 100 months, or 8.33 years.  *Id*.  *See also* public docket Case No. 03-cr-288, *United States v. Brown* (WDPA), of which this Court takes judicial notice.

**Assistant District Attorney Stephie Kapourales** testified she took over the Michael Brown 2003 attempted criminal homicide case from another assistant district attorney in her office.  TT at 497-99.  She testified she nolle prossed the prosecution because the U.S. Attorney's Office had adopted the prosecution of the case.  *Id*. at 500.  She was asked during her direct testimony whether she discontinued the case "because Michael Brown was a potential witness in the prosecution of Raymel Addison." *Id*. at 504.  She responded, "No.  I discontinued it because Michael Brown was looking at more time in federal court than state court." *Id.*

During cross-examination, she was asked about the potential sentence Brown faced for a conviction on his two state criminal attempt homicide charges versus the possible sentence he faced on his federal criminal firearms charge.  *Id*. at 505–09. She responded she did not know if there was a mandatory sentence with Brown's federal sentence, but it was her understanding Brown "was looking at a larger amount of time in federal court than he would be [in state court] even it was a gun case." *Id*. at 508, 511.  After she spoke with the Assistant U.S. Attorney handling Brown's federal case, she "called the cops and they chose to go to federal rather than state." *Id*. at 511.

On redirect this exchange occurred:

Q:  Did I ask you to discontinue that case, ma'am?

A:  No sir.

Q: You were asked about three strikes and so forth. Are you aware that, in fact, Michael Brown already has three strikes in federal court?

A: I was under the impression that he did and that is why he was going fed.

Q: Are you aware that he could possibly go to jail for life?

A: Sir, I did this because I was told 15 years to life.

Q: One other thing. It is sometimes the case that people perceive a benefit if they testify. You are familiar with that?

A: Yes, sir.

Q: Is it your practice to confer that benefit upon them say by getting rid of a case before they even perform their part of the agreement, before they testify or something like that in a court case?

A: The few times that I've had one individual who has pending charges testify against another individual I would never withdraw the charges before the case that was at issue. For example, the Michael Brown case never would have been withdrawn before he testified here this week. I would have waited until after to make sure that he did what he was supposed to do. That is practice. It is common sense. If I withdraw this case before, you know, he could have done anything so I would not have withdrawn this case before if it was in exchange for his testimony. The issue was that he was looking at more time down the street.

TT at 512-13.

Next called to testify was **Deputy District Attorney Ross Lenhardt**. He testified he was familiar with both federal sentencing guidelines and state sentencing statutes. He testified he had reviewed Michael Brown's criminal history and "it would appear" Brown's federal sentencing guideline range was between 262

months and 327 months of incarceration. *Id*. at 525. He also testified substantial cooperation could decrease a person's penalty, but the federal government has to ask for it, the defendant has no right to ask for such a departure. *Id*. at 525-27.

On cross-examination, Deputy District Attorney Lenhardt stated Brown had three prior violent felonies, which appeared to make Brown an armed career criminal under the Armed Career Criminal Act ("ACCA"), making his sentence a mandatory minimum 15 years to life. *Id*. at 530-31. He testified the only way Brown could "get out from underneath 15 years minimum" was if the federal government filed a 5K1.1 motion. *Id*. at 530. Lenhardt also testified on cross-examination that he did not know why Brown had not pled at that time to his federal charge. *Id*. at 534.

The final witness called in the Commonwealth's case in chief was **City of Pittsburgh homicide detective Brian Weismantle**. He and his partner, Detective Patrick Moffatt, interviewed Michael Brown on December 7, 2004. *Id*. at 544. Brown told the detectives he observed both Miyares and Addison displaying hand guns, but he did not see the fired shots because, "when the guns were pulled . . . he left, he ran." *Id*. at 545.

About eight days later, on December 15, 2004, Detective Weismantle met again with Michael Brown, who was accompanied by his attorney in the federal case. This time, according to Detective Weismantle, Brown said,

> he was present for the shooting and he just did not want to talk about it the week prior. He said – basically gave the same story except up until the point where the shooting occurred. At that time he said Tennille hit the

> victim, Jamone Miyares, with a bottle.  He pulls out a gun
> and as he's waving it on the ground, there is some words
> going between the defendant and Jamone.  At that time
> the defendant pulls his gun and shoots Jamone hitting
> him.  He further states that the victim, Jamone, shoots
> and he is backing way and as he is backing away, he is
> able to fire his gun, he believes, striking the . . .
> defendant.

*Id.* at 548-49.

Detective Weismantle had no contact with Brown again until October 7, 2004, when Brown was brought to the courthouse to talk with Weismantle and Deputy District Attorney Fitzsimmons about his expected trial testimony.  Brown's federal defense attorney was present again for that interview.  *Id.* at 549-550. Brown this time said that after Miyares pulled out his gun and was waving it, the gun discharged, and that was when Addison fired.  *Id.* at 550-51.

Weismantle also testified Brown stated that on the drive to the hospital, the four people in the car had concocted a story that if asked by the police what happened, they would say Addison "was being robbed and that was how he was shot."  *Id.* at 551.  Weismantle acknowledged he had failed to include this information in his report of the October 7, 2004 interview.  *Id.*; *see also id.* at 556.

On cross-examination, Weismantle summarized the statements made by Brown during his three interviews.  He acknowledged in all three interviews Brown consistently said Miyares took out his gun first.  In the first interview, Brown said he did not see any shooting but ran down the street and heard shots; in the second, Brown said Miyares got out his gun and Addison fired in retaliation; and in the third, Brown said Miyares waved his gun towards the ground and fired, and then

29

Addison fired.  *Id*. at 554-55.  Weismantle agreed Brown had testified at trial that Miyares had his gun pointed at knee level and he agreed Brown had never previously stated that anyone had fired a "warning shot."  *Id*. at 556.

### ii.    Addison's Case-in-Case

Addison began his case-in-chief by calling **Pittsburgh Police Detective Christine Williams.**  Detective Williams testified that when she interviewed James Stallworth he said that Miyares had "racked the slide" of his gun several times while in the bar.  On cross-examination, Detective Williams testified that Stallworth did not describe any live round flying out of the gun when Miyares was racking it and, in fact, the magazine was not even in the gun at that time.  *Id*. at 584.

Addison's second and final witness was **Donald Richards**.[20]  He testified he had been at the Uptown Cafe and was walking home and "pretty much watched the shooting from a considerable distance."  *Id*. at 590.  Richards had gone to the bar to buy cigarettes and as he entered the bar he could see Miyares was visibly angry. *Id*. at 592-93.  At one point, he saw Miyares drop a gun in the bar.  *Id*. at 592.  He saw Miyares exit the bar and Richards left soon after and began walking home.  He testified he saw Addison in his car coming down the street and saw Addison get out of the car "not too far from the entrance of the bar" and appeared to have words with Miyares.  *Id*. at 595-96.  He testified he saw "sparks hit the ground.  I seen Mr. Addison buckle, . . . and I seen Jamone buckle and by that time I was gone."  *Id*. at

---

[20]    In the Amended Petition, Donald Richards is mistakenly referred to as "Donald Richardson." *See* ECF No. 33 at 53.

596.  When asked who shot first, Richards responded, "It could have been Jamone, it could have been Mr. Addison like I said so I don't know sir."  *Id.*  at 596.

Richards acknowledged during his direct testimony he had testified during the coroner's inquest that Miyares had fired first.  *Id.* at 599-600.  When asked again on direct examination, "who shot first?," Richards responded,

> Once again sir, I seen [Miyares] shoot.  I can't say who shot first.  I mean, I made that statement and I sat and thought about it over the last few years and I can't say if he necessarily shot first with definite conclusions.  I seen [Addison] walk to the left.  I seen [Miyares] as if he was getting punched in the stomach and buckle off to the side and by that time I was gone, sir.

*Id.* at 606.  Richards explained he testified at the coroner's inquest that Miyares shot first because "that is the individual who was facing me, sir, that's what I seen first."  *Id.* at 607.  He also testified,

> I do believe [Miyares] shot first but at the same time, like I just said, sir, . . . Addison, his back was facing from me. I seen him buckle simultaneously. I seen [Miyares], seen the muzzle spark from [Miyares's] gun, yes.  In my mind I thought [Miyares] shot first.

*Id.*

The following exchange then occurred between defense counsel and Richards:

> Q:    What have you received from the district attorney's office monetarily to testify?
>
> A:    Monetarily?
>
> Q:    Yes.
>
> . . .
>
> A.    I just answered his question.  The district attorney gave me no monetary to testify.

31

Q:      They put you up in the hotel for the coroner's inquest?

A:      Because I feared for my life.  Can I answer you, sir?

Q:      Did they put [you] up in a hotel?

A:      Yes, sir.

Q:      And since that time what have they done for you?

A:      They have helped me get some food to eat, things of this nature.  They have helped me but not given me – to answer the question is they have not given me monetarily to testify, sir, no.

. . .

Q:      Are they paying your rent?

A:      Yes, but that is not getting me to testify.  That is because I asked for help and they helped me, sir.  They didn't pay me to testify, no sir.

Q:      They are paying your rent and food?

A:      Yes, sir, but they didn't pay me to testify, no sir.  I asked for help.  That's what they gave me, help.

Q:      Is that why are you hedging in your testimony?

A:      No, sir.

TT at 607-611.

On cross-examination, Richards testified Addison and Miyares "both buckled simultaneously" and then Miyares fell facedown to the ground.  *Id.* at 626.

He testified he saw Addison a few days after the incident.  He had spoken with Addison on the phone and then went to Addison's apartment.  "Addison opened

32

the door with his girlfriend in front of him pointing a gun at [Richards]." *Id.* at 629.
Addison asked Richards if could sell some coke for him. Richards took the coke and
left. *Id.* Later that night, around 3:00 AM, two unknown individuals knocked on
the door of Richards' sister's house, where he was staying. *Id.* at 630. Richards did
not open the door as he did not know who the individuals were. He testified he was
"scared" and went to the police because of his safety concerns. *Id.* Richards
testified that after the police agreed to help him, he went to Massachusetts and
then went missing for a while. *Id.* at 632-33. "Nobody knew where I was. That's
the way I really intended it." *Id.* at 634. He did not want to be involved anymore as
he had "ties to the defendant and the victim. I felt conflicted. I still do." *Id.*

Richards acknowledged that he was more than 240 feet from the area where
he said the shooting occurred and the area was dimly lit. *Id.* at 619. He also agreed
he could not see Addison's gun during the incident because Addison's back was to
him, but stated he heard two distinct shots, and saw bullets hitting the ground. *Id.*
at 635.

On redirect, Richards testified he did not think Addison had threatened him.
After Richards was let into Addison's apartment, he sat on the couch and Addison
told him, "I got shot, dog. You should help me. I'm fucked up." *Id.* at 639. [21]

---

[21]    On March 22, 2010, Richards signed an Affidavit recanting his trial testimony:

> The testimony that I gave during Mr. Addison's Trial was not true. I
> also lied about some guy's coming to my house at night. When I said
> in open court that, "I seen three guy's in black, this was a lie, it never
> happened." . . . I also lied when I said, "I seen [Addison] with a gun
> and shooting the victim, Jamon Miyares." The truth is I seen Mr.
> Miyares shoot Mr. Addison while Mr. Addison . . . had his hands up in

### C.    Closing Arguments

In his closing argument, Addison's counsel argued Addison acted in self-defense: Addison was shot at first and "he did what the law permits him to do. That is, fire back. It is that simple." TT at 654.

The Deputy District Attorney explained it was the Commonwealth's position "not that this is third degree murder, not that this is voluntary manslaughter, but this is first degree murder, this is the premeditated, deliberate, malicious taking of life of another human being." *Id.* at 663.

### D.    Jury Instructions and Verdict

At the end of closing arguments, the trial court gave its final charge to the jury. TT at 687-725. The jury was instructed there were four possible verdicts: "not

---

the air. I never saw Mr. Addison with a gun. The detectives and District Attorney of the case said, "They would help me with my current criminal charges if I lied on Mr. Addison. The District Attorney stated, "I had choices, take the stand and lie on Mr. Addison or if I did not take the stand, I would be put in jail for a very long time. . . .

I, Donald Richards, lied on the stand about the District Attorney not giving me anything to testify against Mr. Addison. The truth is they paid me with things such as paying rent, and gave me food, to testify on Mr. Addison. . . . The District Attorney also told me he was not going to call me but he was going to let Mr. Raymel Addison's Attorney call me that way it would be a open and closed case. These statements were lies I told in court to help myself.

ECF No. 33 at 61 (quoted verbatim); *see also* original second PCRA Petition contained in state court file, No. 49, with attached affidavit of Richards.

Addison filed a second PCRA Petition on June 16, 2010. The PCRA court dismissed the petition as untimely and the Superior Court affirmed finding that Addison had offered "no information about his exercise of due diligence in ascertaining the facts or the information about the circumstances surrounding the revelation." Consequently, the Superior Court concluded Addison had failed to properly plead an exception to the one-year filing requirement relative to the proffered affidavit and, and the petition's dismissal for lack of jurisdiction was affirmed. *Commonwealth v. Addison*, No. 1848 WDA 2010, Memorandum (Pa. Super. Ct. July 27, 2011).

guilty or guilty of one of the following crimes: murder of the first degree, murder of

the third degree, or voluntary manslaughter" and instructed on the elements of

each. *Id.* at 696-703.

The jury was also given detailed instructions on self-defense or justification:

> The defendant claims that he shot the victim in self-
> defense. Self-defense is a justifiable complete defense to
> the Commonwealth. The Commonwealth has the burden
> of proving beyond a reasonable doubt that the defendant
> did not act in justifiable self-defense. The basic rule for
> self-defense is that a defendant is justified in using force
> against another if he reasonably believes he is in
> imminent danger of unlawful force from that person and
> reasonably believes it is necessary then and there to use
> the force which he does use to protect himself. Note that
> a defendant's right of self-defense depends on what he
> reasonably believes. Thus, the right of self-defense may
> be available not only to a person who is in actual danger
> of unlawful attack but also [ ] to one who mistakenly
> believes that he is. . . . .
>
> There are other requirements for justifiable self-defense
> besides those in the basic rules. The additional
> requirements are more restrictive if a defendant uses
> deadly force to protect himself than if he uses non-deadly
> force. If a defendant employs deadly force to protect
> himself, his use of the force must meet the following
> requirements as well as the basic rule. The defendant
> must reasonably believe that he is in immediate danger of
> death or serious bodily injury from the other person and
> reasonably believes that it is necessary then and there to
> use deadly force upon that person to protect himself. The
> defendant must have been free from fault in provoking or
> continuing the difficulty which lead to his use of deadly
> force and the defendant must have violated no duty to
> retreat . . . .
>
> Because the Commonwealth has the burden of disproving
> the claim of self-defense, you cannot find the defendant
> guilty of any crime unless you are satisfied beyond a

> reasonable doubt that the defendant did not act in
> justifiable self-defense. . . .

*Id.* at 704-07.  The jury was then discharged to begin its deliberations.

After receiving a jury question asking about the definition of the three homicide charges, the trial court reinstructed the jury on each of the elements of murder of the first degree, murder of the third degree, and voluntary manslaughter. *Id.* at 727-733.

The jury ultimately convicted Addison of Third-Degree Murder and of carrying a firearm without a license.  *Id.* at 733-34.

## V.   Analysis

The Supreme Court has emphasized that "tenable actual-innocence gateway pleas are rare[,]" *Schlup*, 513 U.S. at 329, and involve "extraordinary" circumstances.  *See House*, 547 U.S. at 538 ("[I]t bears repeating that the *Schlup* standard is demanding and permits review only in the extraordinary case.") (citations and internal quotation marks omitted).  For instance, in *House*, "the Supreme Court held that the petitioner had stated a *Schlup* gateway claim because the central forensic proof connecting him to the crime had been called into question, and he had put forward evidence pointing to a different suspect." *Wright v. Superintendent Somerset SCI*, 601 F. App'x 115, 120 n.16 (3d Cir. 2015).  The Supreme Court found that "although the issue is close, we conclude that this is the rare case where – had the jury heard all the conflicting testimony– it is more likely than not that no reasonable juror viewing the record as a whole would lack reasonable doubt." *House*, 569 U.S. at 554.

36

Addison has presented no new evidence of innocence which makes this case the rare case involving extraordinary circumstances. The only new evidence is the actual written plea agreement - which Addison argues supports his actual innocence claim and casts doubt on Michael Brown's testimony. The written plea agreement, however, is not as helpful to Addison as he contends. The Supreme Court has stated that newly discovered impeachment evidence "is a step removed from evidence pertaining to the crime itself" and "tends only to impeach the credibility of the witness*." Calderon v. Thompson*, 523 U.S. 538, 563 (1998). As a result, newly discovered evidence brought forward to impeach a prosecution witness will seldom, if ever, establish actual innocence. *See Sawyer v. Whitley*, 505 U.S. 333, 349 (1992); *Munchinski v. Wilson*, 694 F.3d 308, 338 (3d Cir. 2012) (impeachment evidence generally not is sufficient to satisfy an actual innocence claim based on newly discovered evidence) (citing *Schlup*, 513 U.S. at 324)); *Hussmann v. Vaughn*, 67 F. App'x 667, 668-69 (3d Cir. 2003) (actual innocence not established where two new affidavits would merely impeach credibility of Commonwealth witness).

Here, the jury heard testimony about Michael Brown's extensive criminal history and that there was an incentive for him to testify against Addison as he was "hoping" his testimony would lead to a lenient federal prison sentence. TT at 447. The jury heard Brown likely faced a mandatory minimum 15 years – life in prison and that a sentence below that would only be authorized if the federal prosecutor filed a motion requesting a departure. *Id*. at 455. Further, the jury heard about the

inconsistencies in Brown's descriptions of the shooting, with the latest version being Addison "shot first," given just two days before he testified at Addison's trial.  *Id.*

But even if the jury had been told Brown had in fact "brokered" a leniency agreement with the U.S. Attorney's Office, such evidence would serve only to impeach Brown's credibility.  Addison's trial counsel conducted an extensive cross-examination and impeached Brown on other grounds – namely, the inconsistencies in his statements made during his interviews with the police and his trial testimony.  Further, the jury heard the possibility of time Brown faced in federal court as well as his hope for leniency in exchange for his testimony. Finally, both the prosecutor and defense counsel emphasized in their opening statements and closing arguments that Brown's credibility was a key issue for the jury to decide.

The jury also heard testimony that Addison had given inconsistent statements about the incident.  Officer Sellers, who talked to Addison while he was being treating in the emergency room, testified Addison told him he had gone to the Uptown Cafe to pick up his girlfriend, he had gotten out of the car to let her in the passenger side door, and that was when he heard shots and realized he had been shot.  Addison told Officer Sellers he did not see who was shooting.  *Id*. at 334.  Yet when Addison was interviewed by Officer Hitchings a few days later, Addison said he heard the shots when he exited his car and he observed the man who was killed shooting towards Downtown and someone was shooting back at him.  *Id*. at 348-49.

There was also testimony adduced of contradictory statements about where Addison was when he received the phone call from his girlfriend.  Officer Hitchings

testified Addison told him he was sleeping when he received her phone call, *id*. at 347-49;  Michael Brown testified he and Addison were on the sidewalk outside of Addison's apartment smoking when Addison received the call.  *Id*. at 386-87.

And the jury heard Donald Richards' testimony he saw "sparks coming off the ground," TT at 596, although Richards also testified he was on a dimly lit street about 240 feet from the shooting, and only Miyares was facing towards him as Addison was facing away from Richards.  *Id*. at 607, 619, 635.  The jury was also made aware Richards' testimony at the coroner's inquest was inconsistent with his trial testimony.  *Id*. at 607.

There was also witness testimony it was raining hard that night.  *Id*. at 195, 225, 322.  Although Brown testified it had not rained but agreed it was a "hot, steamy, summer night." *Id*. at 463.

The jury also knew Addison's defense was self-defense / justification, *id*. at 48, 54, 654, that Miyares was armed with a firearm, that Addison had been shot in the leg, and was instructed on the requirements needed to find justifiable self-defense.  *Id*. at 704-07.  Yet it convicted Addison of Third-Degree Murder.

Following a thorough review of the entire newly supplemented record, the Court is not persuaded "that, in light of the new evidence, no juror, acting reasonably, would have voted to find [Addison] guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 329; *McQuiggin*, 569 U.S. at 386.  As a result, Addison has failed to make a gateway claim of actual innocence to overcome the untimeliness of

his petition.  Accordingly, the motion to dismiss will be granted and the petition dismissed as untimely.

## IV.   Certificate of Appealability

The only remaining question is whether to grant Addison a certificate of appealability under 28 U.S.C. § 2253(c)(2).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." § 2253(c)(2).  "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim," the Supreme Court has said, a certificate of appealability "should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Applying this standard, the Court finds a certificate of appealability should not issue in this case.

## V.   Conclusion

For the reasons set forth, the Court cannot conclude that "no juror, acting reasonably, would have voted to find [Addison] guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 329; *McQuiggin*, 569 U.S. at 386.  Accordingly, based on all the evidence before the Court, including the newly supplemented record, the Court finds Addison has failed to sustain his burden of presenting new evidence demonstrating his actual innocence and, as a result, he cannot rely on the actual innocence gateway to overcome AEDPA's statute of limitations.  As a result,

Addison's petition is barred by AEDPA's one-year statute of limitations and the Respondents' motion to dismiss will be granted and the petition will be dismissed with prejudice as untimely, without issuing a certificate of merit.  An accompanying Order follows.

Dated:  June 23, 2025                    BY THE COURT:


                                        s/Christopher B. Brown
                                        Christopher B. Brown
                                        United States Magistrate Judge



cc:    All Counsel of Record
       (via ECF electronic notification)